IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 18, 2005 Session

## IN RE ESTATE OF JEWELL TURNER, Deceased

## JOHN LeCORNU
### v.
## DOLORES ARCHIE AND FREDE CLEMENTS

An Appeal from the Probate Court for Madison County
No. 03-12852   Christy R. Little, Judge

No. W2004-02123-COA-R3-CV - Filed August 30, 2005

This is a will contest. In May 2002, the decedent had a stroke at age ninety-five. She had no children, and the plaintiff nephew and the defendant niece and defendant nephew took over her care. The three parties established a conservatorship, became co-conservators, and placed the decedent in a local nursing home. Later, the parties agreed to move the decedent to a nursing home closer to the defendants. Soon after the move, without informing the plaintiff, the defendants brought a lawyer to the decedent so that she could draft a last will and testament. In October 2003, the decedent died. The decedent's will left her $550,000 residuary estate to the defendants, and left only two pieces of furniture to the plaintiff. The plaintiff filed the instant petition to contest the will, alleging that the decedent was unduly influenced by the defendants. After a bench trial, the trial court upheld the will, concluding that the burden of proving undue influence had not been met. The plaintiff now appeals. We affirm, finding that the evidence supports the trial court's finding that the decedent received independent advice in the drafting of her will.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Larry A. Butler and Lisa A. Houston, Jackson, Tennessee, for the appellant, John LeCornu.

Jesse H. Ford, III, Jackson, Tennessee, for the appellees, Dolores Archie and Frede Clements.

**OPINION**

Jewell Turner ("decedent"), the decedent involved in this action, is the aunt of Plaintiff/Appellant John LeCornu ("LeCornu") and Defendants/Appellees Dolores Archie ("Archie") and Frede Clements ("Clements") (collectively, "defendants"). Sometime before May 2002, when she was ninety-five years old, the decedent suffered a stroke which resulted in dementia. Since the decedent had no children of her own, the parties in this action assumed responsibility for her care. The decedent was then moved from her home in Jackson, Tennessee, to a nursing home in Jackson.

On May 14, 2002, plaintiff LeCornu and the defendants jointly filed a petition in the general sessions court to establish a conservatorship for the decedent. In the general sessions proceedings, the decedent was held to be incompetent, and LeCornu and the defendants were appointed as her co-conservators.

Soon thereafter, a dispute arose among the co-conservators regarding where the decedent should reside. LeCornu lives in Annapolis, Maryland, and the defendants live in Greenfield, Tennessee. The defendants wanted to have the decedent moved from the Jackson nursing home to a nursing home in Martin, Tennessee, which was closer to the defendants. LeCornu objected to moving the decedent unless her physicians approved of the move. The decedent's physicians initially said that moving the decedent to another nursing home would not be in her best interest. LeCornu and the defendants continued to disagree, so a guardian ad litem was appointed to determine whether moving to the Martin nursing home would be in the decedent's best interest. The guardian, Charles Exum ("Exum"), found that the move would not be detrimental to the decedent, that it would place her closer to the defendants, and that it would be less expensive. Later, the decedent's physicians changed their positions and decided that the move would not be harmful to the decedent. Eventually, the parties all agreed to move the decedent to the nursing home in Martin.

Soon after the move, on December 24, 2002, Archie wrote LeCornu an e-mail suggesting that the decedent's conservatorship be terminated, expressing concern that the cost involved would "eat up [the decedent's] savings." She felt that dissolving the conservatorship would make it easier on all of them, and suggested that they all "just agree to share [in her estate] equally." LeCornu opposed dissolving the conservatorship, so no such agreement was reached.

Subsequently, without LeCornu's knowledge, the defendants hired an attorney, Susan Collins ("Collins"), to meet with the decedent in the nursing home in order to help the decedent make her Last Will and Testament ( "Will"). Collins required that the defendants obtain a medical statement verifying that the decedent had the testamentary capacity to make a Will. On February 11, 2003, a psychologist, Tony Franklin, Ph.D. ("Dr. Franklin"), conducted a mental status examination of the decedent, and he opined that she was capable of making decisions on her own behalf. On March 14, 2003, a psychological examiner, Gary Smithson ("Smithson"), also conducted a mental examination of the decedent and opined that she was competent and of sound mind. These examinations were performed without LeCornu's knowledge, though he was still a co-conservator for the decedent.

Thereafter, in April and May 2003, Collins met with the decedent on four occasions. At the first meeting, the defendants introduced Collins to the decedent, and then Collins was left to speak alone with the decedent. At the second meeting, the defendants were present and a draft of the Will was read to the decedent, but the decedent did not sign the Will at that time. Later, the Will was changed to name the defendants as the beneficiaries of her residuary estate, which was worth about $550,000 at that time, or about eighty-five percent of the entire estate. The Will left LeCornu a buffet and a gold-framed mirror. On May 2, 2003, the decedent executed the Will in the presence of Collins and two witnesses, but not in the presence of the defendants.

On October 1, 2003, the decedent died. Two days later, the defendants filed the Will in the Probate division of the General Sessions Court below. On November 17, 2003, the defendants filed a Motion for Appointment of Co-Executors. On December 19, 2003, LeCornu filed the instant complaint to contest the Will, alleging that it was procured by the defendants through undue influence. On January 14, 2004, the trial court rejected the defendants' petition to be appointed as co-executors and instead appointed Charles Exum, the guardian ad litem appointed in the conservatorship, as the personal representative of the estate.

On July 26, 2004, the trial court conducted a bench trial on LeCornu's will contest. Prior to trial, the defendants stipulated that they had a confidential relationship with the decedent. Much evidence was submitted at trial on the issue of whether the decedent had the testamentary capacity to execute the Will. Collins testified at trial. As background, Collins said that she became familiar with the defendants by drafting a will for Archie's mother, the decedent's sister Stella. Archie told Collins that the decedent was under a conservatorship, but Collins could not recall whether she was told that LeCornu was a co-conservator. Before she would undertake the drafting of the decedent's Will, Collins required a letter from the decedent's physician stating that she was competent. The defendants gave her two letters, one each from Dr. Kenneth Carr ("Dr. Carr"), the medical director of the Martin nursing home, and Dr. Franklin, both stating that the decedent had the requisite testamentary capacity.

In order to draft and finalize the Will, Collins met with the decedent four times. Collins said that, when she first met the decedent, both of the defendants were present, but that they left the room when Collins and the decedent began to discuss the Will. The decedent was in a wheelchair and used a hearing aid. To communicate with the decedent, Collins had to speak into a special hearing device with a microphone. The decedent did not mention to Collins that she was under a conservatorship. She commented that Archie and Clements "took care of her business," but did not mention LeCornu in that context. When Collins asked the decedent about her family, she identified Archie as the daughter of her deceased sister Stella, LeCornu as the son of her deceased sister Mabel, and Clements as the son of another of her sisters whose name Collins could not recall. The decedent forgot the name of Archie's son, but described him as the person who "worked for the IRS and . . . had something wrong with his arm." When asked about her assets, the decedent told Collins that she had about $400,000 in CDs, a house in Jackson, Tennessee worth between $80,000 and $90,000, and a house in Greenfield, Tennessee worth about $40,000. She noted that Clements took care of the house in Greenfield for her.

From her first meeting with the decedent, Collins testified, she was convinced that the decedent had testamentary capacity, because she knew about her assets and could identify the "natural objects of her bounty." Archie had given Collins a list of assets, which Collins read to the decedent. The decedent told Collins exactly what pieces of property she wanted to leave to which beneficiaries. She devised to LeCornu a buffet and a mirror. She also asked that her late husband's clothes and books be given to her late husband's nephew. Collins remarked that the decedent's memory was "[a]mazing. . . . I'm not sure I would have remembered as well what I have in my house." Next, the decedent told Collins that she wanted to give a cash bequest to the defendants. Collins asked, "What about Mabel's son John [LeCornu]?" The decedent responded, "I've already left him something. . . . That's it. That's what I'm leaving him." Collins testified that the decedent told her that LeCornu had taken an unspecified amount of money from her in the past, and that "if he turned up with a will . . . it was no good."

The decedent considered making a bequest to two churches. When discussing a possible devise to the churches, the decedent asked Collins how much the churches would get if they shared in the residuary estate. Collins told her that, depending on how long she lived, they might get very little, or they might get hundreds of thousands of dollars. Collins said that the decedent "understood that the specific beneficiaries would come in before the residue."

Collins said that two assistants in her office, Beverly Parham ("Parham") and Winniford Vowell ("Vowell"), went with her to the second meeting with the decedent, in order for them to witness the execution of the Will. Archie and Clements were present at this meeting. Collins said that she normally prefers to have only the testator in the room, but the decedent told her that the defendants could stay. Because the decedent could not see well enough to read the draft Will, Collins read it aloud to her. Archie asked the decedent if she understood what Collins was saying and what she was signing. Collins' "gut feeling was that she was not totally comfortable," that perhaps she was nervous. Collins felt that the decedent was not ready to sign the Will on that day. Therefore, Collins, Parham, and Vowell left to return another time.

After that first reading of the Will, Collins testified, the decedent made a number of changes to it. She changed the amounts that she was leaving to certain persons, added a bequest to the animal shelter, and added other churches as beneficiaries. Collins described it as a "detailed" Will. Significantly, on April 30, 2003, the decedent made the defendants the residuary beneficiaries of her estate. Thereafter, on May 2, 2003, Collins and her assistants visited the decedent, and at that time she executed the Will. The defendants were not present at this final reading of the Will. The final version of the Will included a "handful of specific charitable bequests," and the rest of the estate went to the defendants. At that meeting, the decedent asked Collins to keep her Will in her office and to not let anyone know about it until after she had died. Although Collins normally charged $150 per Will, she did not send a bill to the decedent's co-conservators, because sending a bill would have alerted the co-conservators that a will had been completed. After the decedent's death, Collins testified, she did not file a claim against the decedent's estate because she had "become very fond of Ms. Turner. If I never got paid, it would be all right. And I was much more concerned about the

fact that I had an attorney/client relationship with her . . . .  If it took not getting paid, then that's okay with me."

Collins testified she had no concerns about whether the decedent was competent to execute a will.  She stated that the decedent "had a very good grasp of" what she owned and to whom she was related, and that she asked appropriate questions.  Collins observed that the decedent's questions to her regarding her residuary estate were clear and appropriate.

Vowell and Parham, Collins's assistants, also testified at trial.  They both said that the decedent appeared competent to make a will.  Vowell described the decedent as talkative, coherent, and polite, and said that she discussed with them current events that she had learned of from watching television.  Vowell testified that she had no problem with the decedent's competency.  Parham testified that she met with the decedent on three different occasions, and observed that the decedent was "up, dressed, very alert, she was very nice to us."  She also commented that the decedent talked about current events, and said that she seemed to understand Collins' explanations to her.  Parham believed that the decedent "knew what she wanted" and felt comfortable signing the Will.

The trial court also heard testimony from Smithson, the psychological examiner who conducted a mental examination of the decedent.  Smithson testified that he met with the decedent in March 2003 for about forty-five minutes to determine whether she was competent to make a will.  In that meeting, he evaluated her memory function and her ability to reason.  He gave the trial court examples of the questions he asked her and the tasks he asked her to perform.  After the examination, Smithson concluded that the decedent had the required testamentary capacity, and that her cognitive abilities were intact.

The defendants proffered the testimony of Andrea McKnight ("McKnight"), the certified nurse's aide (CNA) who attended to the decedent in the nursing home.  McKnight testified that she took care of the decedent's basic needs every morning.  McKnight said that she talked with the decedent on a daily basis, and that the decedent discussed her family, her former husbands, McKnight's family, and current events.  McKnight said that the defendants called the decedent and visited her, and that others sent flowers and cards.  She stated that, in her observation, the decedent had no memory problems.

Randy Stacy ("Stacy"), the pastor of Archie's church, testified that he visited the decedent in the nursing home.  He said that, on their visits, they would talk in depth about politics, religion, the war, and other subjects.  Stacy thought that the decedent was a very enjoyable, "sharp" lady.

Another psychologist, Robert W. Kennon, Ph.D. ("Dr. Kennon"), also testified at trial.  Dr Kennon examined the decedent in May 2002 for the purpose of establishing the conservatorship.  He said that, at the time he saw her, she was not capable of managing her own affairs.  She had expressive language difficulties and experienced some confusion problems.  He stated that, typically, in that circumstance, it would be easier to influence a stroke victim.  He opined that, although a

stroke patient can recover physically over the first nine months after a stroke, the deep-brain mental faculties affected by the stroke are much less repairable. Dr. Kennon reviewed the mental status examinations performed by Smithson and Dr. Franklin. Dr. Kennon questioned whether Smithson could perform an appropriate evaluation in forty-five minutes, although he admitted it was possible. It concerned Dr. Kennon that Smithson stated that he found no hearing deficiency, because the decedent's hearing deficiency was severe. Dr. Kennon observed that Dr. Franklin's evaluation was more in depth. However, in order to believe Dr. Franklin's report, Dr. Kennon stated, one would have to believe that the decedent had made a miraculous recovery from May 2002.

Two friends of the decedent, Pam Bain ("Bain") and Evelyn Johnsey ("Johnsey"), testified on behalf of LeCornu. Bain indicated that the decedent was very close to Mabel, LeCornu's mother, and said that they were like twins. Bain said that the decedent talked about LeCornu a lot, but mentioned Archie only once or twice. Bain said that the decedent talked about Archie's son who became a doctor, and that she mentioned Clements because he took care of her house in Greenfield. Bain testified that the decedent was proud of LeCornu because of his accomplishments. Like Bain, Johnsey testified that the decedent talked about LeCornu on a regular basis, but never mentioned Archie. She recalled that the decedent spoke of a nephew who took care of her house in Greenfield. Johnsey testified that, when Bain called her about the decedent's stroke, she immediately called LeCornu, who "took over from there." She said that, after the decedent's stroke, Archie and Clements went to see her at the hospital the next day. When Johnsey spoke to Archie, Archie asked her if the decedent had a will.

LeCornu also testified at trial. He said that he was born and raised in Nashville, and later served twenty-eight years in the Marine Corp. After his years in the Marine Corp., LeCornu said, his family stayed in Annapolis. At the time of trial, he was working as a prosecutor in Maryland in the state attorney's office. LeCornu said that he had had a very close relationship with the decedent and that he loved her very much. He noted that the decedent and her husband had traveled with his parents to his graduation from the naval academy in 1961, and also to his wedding in Washington D.C. thereafter. LeCornu testified that the decedent and his mother, the decedent's sister Mabel, lived next door to each other. LeCornu commented that he tried to write to the decedent whenever he could, particularly on occasions such as Mother's Day, Thanksgiving, and Christmas. As the decedent and his mother became older and more frail, LeCornu said, they required more involvement from him, albeit from long distance. In 1998, he visited the decedent for ten days to two weeks when she had surgery to treat colon cancer. The decedent recovered from her surgery at Mabel's house, and LeCornu helped get her situated and arranged to have sitters take care of the decedent. Despite the decedent's health problems, Mabel predeceased the decedent by two years.

When the decedent had her stroke in May 2002, LeCornu traveled to Tennessee to be with her. He called the attorney who had helped him with his mother's estate to assist him in setting up a conservatorship for the decedent. Thereafter, LeCornu, along with the defendants, set up the conservatorship, with the three of them designated as co-conservators. LeCornu said that, regrettably, he did not visit the decedent again before her death in October of 2003. Between May 2002 and October 2003, he explained, his wife had back surgery, he was diagnosed with terminal

cancer and was undergoing chemotherapy, and he had had a grandchild. Nevertheless, he said, he sent the decedent cards, faxes, and called her on the telephone in order to stay in contact with her.

LeCornu testified that he had opposed moving the decedent to the nursing home in Martin, and he and Archie had communications by e-mail on the subject. At the time, LeCornu thought that the defendants had the perception that he was trying to fight the move to Martin for monetary purposes. The decedent's physicians, he said, initially opposed the move, which angered Archie. In one e-mail, Archie said that she was going to take the issue to court and bring Susan Collins to court with her. This remark angered LeCornu, who had retained his own lawyer to set up the conservatorship. Once Archie began making efforts to force a decision on the placement of the decedent, LeCornu's lawyer withdrew in order to avoid a conflict of interest. LeCornu described that period as "a very tense and hectic time." Later, he said, their relations "mellowed out." LeCornu recognized that the defendants were having to take on all of the "heavy lifting," because he was in Maryland. However, the parties attempted to cooperate in handling the decedent's affairs.

In an e-mail message dated December 24, 2002, Archie proposed to LeCornu that they dissolve the conservatorship and that each of them have a power of attorney instead. She said that "[i]t would be much less expensive, and it would be much easier on us. I will keep the same accounting of her finances . . . and if there is anything left when she passes on, we can just agree to share it equally." LeCornu objected to Archie's proposal, particularly because of the safeguards provided by a conservatorship. The conservatorship required that all major issues for the decedent be decided by the consent of all three co-conservators, and LeCornu felt that the conservatorship would be the best way to deal with important matters. In January 2003, LeCornu sent an e-mail to Archie telling her that he was not comfortable with her proposal. In February 2003, Archie and Clements instigated the procedures for having the decedent draft her Will, without informing LeCornu.

LeCornu testified that he was surprised when he first learned of the existence of the Will, and then when he learned of its contents. He said that, by devising the majority of her estate to the defendants, the decedent completely cut out his family as well as the four children of Ted Ray Clements, the defendant Clements' deceased brother. When asked whether he doubted the truthfulness of Collins' testimony, LeCornu replied, "I have no reason not to believe Ms. Collins. . . . I don't doubt her professionalism or anything like that." When asked the basis for his contention that the decedent was not competent to make a will, LeCornu noted that the decedent had suffered a stroke, was advanced in years, and had been declared incompetent in the conservatorship proceedings. On cross-examination, he agreed that he had no proof that the decedent was incompetent on the day she made the Will, other than the reports from the medical examinations that were performed before the conservatorship was established. When asked about the basis for his assertion of undue influence, LeCornu listed the circumstances on which he relied to support his claim: the confidential relationship between the decedent and the defendants, the physical and mental deterioration of the decedent, the defendants' involvement in procuring the Will, the secrecy of the existence of the Will, the decedent's advanced age, and the unjust or unnatural nature of the terms of the Will. That concluded the testimony presented to the trial court.

On August 2, 2004, the trial court entered an order denying LeCornu's claim of undue influence. The trial court found that the decedent was competent when she made the Will, and that, consequently, "the burden shifts to the person who contests the Will to show undue influence."[1] The trial court considered the factors relevant to determine whether there has been undue influence, and found that it had not been proven. The trial court stated that it based "the majority of" its ruling on the testimony of Collins and others who made certain that the decedent "knew what she was doing" and was comfortable executing the Will. The trial court noted that Collins "read the Will to the [decedent] and took more pain and caution" than most lawyers would take in having the Will executed by the decedent. Accordingly, the trial court concluded, "the undue influence burden has not been met and the Will stands." From that order, LeCornu now appeals.

On appeal, LeCornu argues that the trial court placed the burden of proving undue influence on him and that, because the parties had stipulated that a confidential relationship existed, this allocation of the burden was an error.[2] Once a confidential relationship is established, followed by a transaction in which the dominant party receives a benefit from the other party, then undue influence is presumed, and the burden shifts back to the defendants to show the *absence* of undue influence. Thus, LeCornu argues, the trial court applied an incorrect legal standard in its determination of this case. LeCornu further argues that the defendants failed to submit sufficient evidence to rebut the presumption of undue influence, and the trial court's decision must be reversed.

Whether a will was procured by undue influence is a question of fact. ***Gibson v. Gibson***, No. W2004-00005-COA-R3-CV, 2004 WL 2464271, *3 (Tenn. Ct. App. Nov. 2, 2004). The trial court's factual findings are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. ***Id.***; Tenn. R. App. P. 13(d). Whether the proper legal standard was applied to the case is a question of law, which is reviewed *de novo*, with no such presumption of correctness. ***See In re Estate of Branch***, No. W2004-01310-COA-R3-CV, 2005 WL 711962, at *2 (Tenn. Ct. App. Mar. 28, 2005).

A will contest can be based on the allegation that the testator lacked the requisite testamentary capacity, or on the contention that the will was procured by undue influence. ***See In re Estate of Maddox***, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001). The burden-shifting framework in will contests is set out in ***Maddox***. The appellate court explained that the initial burden lies with the proponent of the will to show that "the will was executed in compliance with all legal formalities." ***Id.*** Such proof "gives rise to the presumption that the testator was capable of making a will," and the burden shifts "to the contestants to prove that the testator was unduly influenced in making his or her will." ***Id.***

---

[1] The trial court had actually announced its determination that the decedent had the requisite testamentary capacity to make the Will before the conclusion of the proof. The trial court then stated, "Now we're stepping back over to the undue influence.".

[2] "A confidential relationship is one where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party." ***Iacometti v. Frassinelli***, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

This Court has recognized that "[i]nvalidating a will because of undue influence is generally not a simple undertaking." **Kelley v. Johns**, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002). Undue influence can be proven by either direct or circumstantial evidence. However, because direct evidence is rarely available, most will contestants try to prove undue influence by establishing the existence of suspicious circumstances that would tend to show that the testator's will was not the result of free or independent action. **Id.** Though courts "have refrained from prescribing the type or number of suspicious circumstances necessary to invalidate a will because of undue influence," several suspicious circumstances have often been relied upon to prove undue influence: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; and (3) the beneficiary's active involvement in procuring the Will. **Id.** at 196 (citing cases). Other examples of suspicious circumstances include: (1) secrecy concerning the Will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the Will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the Will's terms; (6) whether the testator was in an emotionally distraught state; (7) discrepancies between the instrument and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. **Id.**; **Gibson**, 2004 WL 2464271, at *3.

The party challenging the validity of a will bears the burden of proving the existence of suspicious circumstances showing that the testator did not act freely and independently. **Kelley**, 96 S.W.3d at 196; **Maddox**, 60 S.W.3d at 88-89. Without direct evidence of undue influence, the will contestant must establish more than one suspicious circumstance in order to make out a prima facie case of undue influence. "Proof of a confidential relationship alone will not support a finding of undue influence." **Kelley**, 96 S.W.3d at 196; **Maddox**, 60 S.W.3d at 89. If a confidential relationship is established, however, "together with a transaction that benefits the dominant party to the relationship or another suspicious circumstance, a presumption of undue influence arises." **Kelley**, 96 S.W.3d at 196.

Once the presumption of undue influence arises, "the burden of going forward shifts back to the will's proponent to prove by clear and convincing evidence that the challenged transaction or gift was fair." **Maddox**, 60 S.W.3d at 89. Frequently, the will's proponent will show that the transaction or gift was fair by proving that the testator received independent advice. "[P]roof of independent advice becomes necessary only when it would be difficult to show the fairness of the transaction or the competency of the testator without it." **Id.**

LeCornu argues that the trial court below improperly failed to shift the burden of proof to the defendants, and therefore erred as a matter of law. The parties stipulated that a confidential relationship existed between the defendants and the decedent. That fact, along with the other suspicious circumstances such as the benefit to the dominant parties, the secrecy of the Will, the defendants' involvement in procuring the Will, and the decedent's advanced age, triggered the presumption of undue influence. Under these circumstances, LeCornu argues, the burden shifted to the defendants to rebut the presumption of undue influence by clear and convincing evidence. **See Kelley**, 96 S.W.3d at 196.

To determine whether the trial court properly allocated the burden of proof, we examine the trial court's oral ruling, incorporated into its August 2, 2004 order. The trial court stated:

> [I]nvalidating a Will because of undue influence is generally not a simple undertaking. While undue influence can be proved either by direct or by circumstantial evidence, direct evidence is rarely available. Thus, in most cases, the contestants establish undue influence by providing the existence of suspicious circumstances warranting the conclusion that the Will was not the testator's free and independent act. [Quoting ***Kelley v. Johns***, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002).]
>
> Then that's where the factors came in that we've talked about in ad nauseam, which I think I'm very familiar with and I probably have memorized.
>
> \* \* \*
>
> My findings of fact are that, first of all, there is no case law that says, because she was under this conservatorship, she couldn't – didn't have the testamentary capacity, and that goes back to the first prong.
>
> And then my findings of fact on the undue influence are that, first of all, Mr. LeCornu was never present after the stroke to – to personally see her to know whether or not she was – her condition had deteriorated or she lacked the ability. We know she wasn't illiterate.
>
> Second of all, I'm basing a lot of the – and the majority of my ruling on the fact that I don't think any attorney in their right state of mind would bet a hundred and fifty dollars, and actually she received nothing, to lose a law license.
>
> Ms. Collins, who I have never met or even seen or heard before today, was – her testimony was she, along with the two witnesses, Ms. Vowell and Ms. Parham, went above and beyond the call of duty to make certain, first of all, that she was comfortable; that Mrs. Turner was – knew what she was doing; and the fact that she was very specific about her bequests. If it were just a simple "divided two ways", it would certainly raise some red flags – between the two parties who were ultimately named as the residuary beneficiaries. And, I think the thing that's most telling is that she wanted Ms. Collins as an attorney, and she understood that attorney-client privilege thing probably better than some people who are lawyers, and that she didn't want everybody to know.
>
> A wise person said, "Be wise as a serpent, but harmless as a dove." And, I think she didn't want the harm or anyone to be hurt until after her death, and I think that's why she waited.
>
> She also read the Will to her and took more pain and caution, from the testimony I've heard, than many, many lawyers do.
>
> So, it is the ruling of this Court that the undue influence burden has not been met and the Will stands.

Thus, the trial court recognized the proper analytical framework, quoting from ***Kelley***, ***supra***, and noting the "factors came in that we've talked about in ad nauseam, which I think I'm very familiar

-10-

with and I probably have memorized." The trial court then based "the majority of [its] ruling" on Collins' testimony, along with the corroborating testimony of Vowell and Parham. The trial court determined that, based on this testimony, the testator received advice from Collins, that she was comfortable with her Will, and that she was aware of what she was doing. The trial court further credited Collins's testimony that the decedent valued the attorney-client privilege, and that the decedent had decided to keep the Will a secret until after her death.

In viewing the trial court's analysis as a whole, it appears that the trial court found clear and convincing evidence that the decedent received independent advice, sufficient to rebut any presumption of undue influence. The trial court did not clearly articulate the burden-shifting framework. However, the trial court clearly credited the testimony of Collins, who stated unequivocally that the decedent's choices were made of her own free will independent of outside influence. The record supports the trial court's conclusions in this regard. At the outset, Collins was adamant that she be given medical proof that the decedent had the requisite testamentary capacity to make a will. She met alone with the decedent to discuss the bequests in her Will, and the decedent specified her wishes in detail. Collins even asked about LeCornu specifically, given the fact that he is of equal kinship with the defendants. The decedent expressed her desire that LeCornu receive only the items specifically devised. There is no evidence to suggest that Collins conspired with the defendants or that she operated according to their instructions; even LeCornu conceded that he had no reason to doubt Collins' veracity. There are certainly circumstances surrounding the procurement of the Will that are troubling, particularly the fact that the defendants did not inform LeCornu about their efforts to secure a will from the decedent, even though he was the co-conservator of her estate and had communicated with the defendants regarding other decisions about her well-being. Nevertheless, the trial court's decision hinged on its assessment of the credibility of the witnesses. The trial court's credibility determinations are given great weight on appeal, because the trial court had the benefit of observing the witnesses and assessing their demeanor and "is in a far better position that this Court to decide those issues." *Gibson*, 2004 WL 2464271, at *3. To find that the decedent did not in fact receive independent advice would be contrary to the trial court's determination that Collins' testimony should be credited. This we are not at liberty to do.

Under these circumstances, we find that the trial court employed the appropriate legal standard, and that the evidence does not preponderate against its finding that the burden of proving undue influence was not met. Therefore, its decision to uphold the Will must be affirmed.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant John LeCornu, and his surety, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE